# In the United States Court of Federal Claims

No. 21-1540C
Filed: October 7, 2021
Reissued: October 21, 2021[†]

---

YANG ENTERPRISES, INC.,

*Plaintiff,*

v.

THE UNITED STATES,

*Defendant.*

---

*Damien Clemens Specht*, *James A. Tucker,* and *Lyle F. Hedgecock*, Morrison & Foerster LLP, Washington, D.C., for Plaintiff.

*Ioana Cristei*, Trial Attorney, *Steven J. Gillingham,* Assistant Director, *Martin F. Hockey*, Acting Director, *Brian M. Boynton*, Acting Assistant Attorney General, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., and *Major Thomas F. Pfeifer,* Trial Attorney, U.S. Air Force, Of Counsel, for Defendant.

## MEMORANDUM OPINION AND ORDER

TAPP, Judge.

Government agencies are granted a great deal of deference in the pursuit of their own contracts. However, those agencies may not "turn[] a blind eye to the fairness principles that require that all offerors be treated equitably." *SAGAM Securite Senegal v. United States*, ___ Fed. Cl. ___, 2021 WL 3140559, at *13 (June 25, 2021). It then stands to reason that deference to an agency's decision is not unbridled. While the standard for agency reasoning does not demand crystal clarity, contracting officers must provide a rational, cognizable reason for their decisions, including a decision to outright cancel a solicitation.

In its single-count Complaint, Plaintiff, Yang Enterprises, Inc. ("Yang"), argues that the underlying solicitation was arbitrarily and capriciously cancelled. Among other claims, the

---

[†] This Opinion was originally issued under seal, (ECF No. 32), and the parties were directed to file a notice of redactions consistent with the Court's instructions below. That notice was filed on October 20, 2021. (ECF No. 34). The parties proposed no redactions but requested three minor corrections. Those corrections are accepted. The sealed and public versions of this Opinion differ only to the extent of those changes, the publication date, and this footnote.

United States asserts that cancellation of the Solicitation was reasonable under the circumstances. Though the rationale behind cancellation lacks limpidity and has thereby produced understandable frustration, the Court agrees that the agency has met its minimal burden. Yang's Motion for Judgment on the Administrative Record, ("Pl.'s MJAR"), is denied and United States' Cross-Motion for Judgment on the Administrative Record, ("Def.'s MJAR"), is granted.

## I.   Background

*A.   Solicitation*

On September 13, 2019, the United States, originally acting through the Department of the Air Force, 45th Space Wing,[1] issued Solicitation No. FA2521-19-R-A017 ("the Solicitation") as a competitive small business set-aside under Federal Acquisition Regulation ("FAR") Part 15. (Administrative Record, "AR", Tab 18).[2] The contract was for Ascension Island Mission Services ("AIMS"). (AR 506). Ascension Island is currently a contractor-operated tracking and instrumentation station on a volcanic rock in the South Atlantic. (AR 507). Since the mid-1950's, the United States has used island facilities for signal interception, climate change monitoring, and a National Aeronautics and Space Administration ("NASA") tracking station. (AR 7, 524–525, 1138, 1653). Though Ascension Island provides a highly suitable location for those systems because of its "favorable weather" and unique geographic location enabling access to under-sampled orbital regimes, the island itself is a "highly corrosive" environment. (AR 507, 1653).

Per the Solicitation, the prevailing AIMS contractor would be responsible for various obligations, principally on Ascension Island. (AR 1121). The awardee contractor would be specifically responsible for: lodging and housekeeping; dining; fire/medical emergency management and response; security; morale, welfare and recreation; airfield operations and management; complete logistic functions for facilities, vehicles, and equipment; all civil engineering support; base communications; operations and maintenance of radar and telemetry systems; preventative maintenance; and corrosion control. (*Id.*).

Since approximately 2015, the totality of services enumerated under the AIMS Solicitation has been provided under two separate contracts—the Range Operations Support contract and the Launch and Test Range Services Integrated Support Contract—and by two different contractors. (AR 506). The Range Operations Support ("ROS") contract encompassed base operational services such as lodging and dining, airfield operations and management, and base communications. (*Id.*). Wolf Creek Federal Services ("Wolf Creek") has been performing the ROS contract since 2015. (*Id.*). The Launch and Test Range Services Integrated Support Contract ("LISC") was specific to procuring radar and telemetry support services. (AR 507).

---

[1] The agency is now acting through the United States Space Force, Space Launch Delta 45. The Court will refer to the agency as "the Air Force" prior to its reorganization and as "the Space Force" after reorganization.

[2] The Administrative Record in this case includes ECF Nos. 22, 23, 24, and 25. The Court will refer to the Record by its consecutive pagination in the bottom righthand corner.

Range Generation Next ("RGNext"), a large business joint venture, has been performing under LISC since 2015. (AR 507, 23434). The 45th Space Wing was responsible for managing the ROS contract, but LISC was managed by the Space and Missile Center in Los Angeles, California. (AR 27625; *see also* AR 507). Despite their separate management, the relationship between LISC and ROS were integral to successful operations on Ascension Island. (AR 354). While both contracts were critical, the execution was inefficient and redundant. The Air Force reported that "having multiple contractors resulted in duplication of functions or efforts for logistics, communications and management." (AR 471).

To avoid future blunders, the AIMS contract sought to consolidate geographically located requirements portions of the ROS and the LISC contracts into a single contract. (AR 514, 354). Based on its terms, a replacement ROS contractor would be needed after September 20, 2020. (AR 507). The Air Force planned to let a portion of LISC lapse without renewal and then combine the lapsed LISC portion of requirements on Ascension Island into one contract so that one office could manage the entirety of those services. (*See* AR 507; AR 354). Once the AIMS contract was awarded, the LISC mission-related metric tracking radar and telemetry would be de-scoped from its geographically unrelated requirements. (AR 530). On September 13, 2019, the Air Force issued the Solicitation for the AIMS contract. (AR 991).

### B.    Proposal Submissions and Initial Award

On October 28, 2019, the Air Force received proposals from five offerors and determined three would be considered in the competitive range: Akima Range Readiness Operations LLC ("ARRO"), Chugach Range and Facilities Services ("CRFS") Joint Venture LLC, and Yang. (AR 12673). CRFS was a joint venture composed of Wolf Creek, the large business incumbent, and Chugach Consolidated Solutions, LLC ("Chugach Consolidated"). (AR 23619, 23623). Chugach Consolidated has been a sister company of Wolf Creek since April 25, 2019. (AR 22338, 22645). CRFS also proposed RGNext, the large-business incumbent for the ROS contract, as its subcontractor for the radar portion of the AIMS requirements. (AR 22338).

The AIMS Solicitation provided for a best-value procurement, using three evaluation factors: Factor 1 – Technical; Factor 2 – Past Performance; and Factor 3 – Cost/Price. (AR 1834–35). Factor 1 was further divided into three subfactors: Subfactor 1 – Program Management; Subfactor 2 – Non-Mission Support Services; and Subfactor 3 – Mission Support Services. (AR 517). In evaluating the Technical subfactors, the Air Force rated ARRO and CRFS higher than Yang. (AR 12675–80). For the Technical subfactor, Mission Support Services, it is notable that no offeror had the sole capability to provide requisite radar and telemetry support without either a joint-venture mentor or by subcontracting with a large business. (AR 11261 (Yang's proposal noting: "The selection of Amentum ([f]ormally AECOM) as our team member is significant for the AIMS acquisition because of their current performance with both radar and telemetry requirements"); AR 10671 (CRFS proposal noting: "We have partnered with [RGNext] to provide mission support services"); AR 8881 (ARRO proposal noting the partnership with PAE Applied Technologies because it is a "[t]rusted partner who understands radar and telemetry operations environment/culture")). For past performance, the Air Force rated CRFS and ARRO with "substantial confidence" and Yang's as "satisfactory confidence." (AR 12699). For the Cost/Price factor, the Air Force determined that CRFS had the lowest price, Yang had the next lowest price with a 4.3% price premium over CRFS, and ARRO had the

3

highest price. (AR 12700). Pursuant to its analysis, the Air Force determined that CRFS presented the best value over both offerors. (AR 12697–700). On June 30, 2020, the Air Force made the award to CRFS and notified the other two offerors that same day. (AR 12705).

C.    *Administrative Protests*

Disagreeing with the award's outcome, Yang filed a protest with the Government Accountability Office ("GAO") on July 14, 2020. (AR 12765). Yang went on to file supplemental protests with the GAO on August 24, 2020 and September 2, 2020. (AR 16171, 16290). Yang identified various perceived errors in its supplemental protests, including: (1) the Air Force credited CRFS for the past performance of its large business radar and telemetry subcontractor, even though that subcontractor's proposed workshare fell below the minimum 20% workshare required for consideration of a teammate's past performance; (2) the Air Force credited CRFS for the past performance of Wolf Creek under areas Wolf Creek was not proposed to perform, which the Solicitation prohibited; and (3) the Contracting Officer's ("CO") unreasonable failure to file a size protest on behalf of the agency when CRFS's proposal violated the small business regulations. (*See* AR 16295–96, 16298, 16300–03). Yang further alleged that CRFS's joint venture contravened federal regulations requiring the small business part of a joint venture to serve as the "managing venture" and that the project manager come from that small business. (AR 16174 (citing 13 C.F.R. § 125.8(b)(2)(ii))).

Based on the substance of Yang's supplemental protests, the Air Force declared that it would take corrective action before the GAO could issue its determination. (AR 16320). In a memorandum issued on September 8, 2020, the CO agreed that the "CRFS's joint venture agreement and proposal appear[ed] to violate 13 C.F.R. § 125.8(b)(2)(ii)." (*Id*.). The CO's decision indicated a belief that "the source selection evaluation was conducted in accordance with the solicitation," but acknowledged that they "w[ere] not aware of the restriction on the protégé's use of a mentor's employee as project manager." (*Id*.). The Air Force's announced corrective action included termination of CRFS's contract, reopening of discussions, an opportunity for offerors to revise proposals to support new evaluations and a new source selection, and guidance from the Small Business Administration ("SBA"). (AR 16321).

On September 25, 2020, the CO notified each competitive offeror that the Air Force would begin the process of making a new award decision. (AR 16324–27). After reopening discussions, all three offerors changed their price: Yang proposed the lowest price, CRFS the next highest, and ARRO proposed the highest price. (AR 23624). Although CRFS presented a 2.37% price premium compared to Yang, the Air Force determined it would be in the Government's best interest to pay such a price premium for CRFS's stronger Past Performance and much stronger Technical Subfactor 3 approach as compared to Yang, even acknowledging that Yang had a stronger approach for Technical Subfactor 1. (AR 23632). Accordingly, the Air Force determined that it would *again* make award to CRFS and issued its Intent to Award to the unsuccessful offerors on December 15, 2020 and then a formal notice of award on January 25, 2021. (AR 23632–35).

On December 22, 2020, Yang filed a size protest with the CO, who referred the protest to the SBA Area Office. (Pl.'s MJAR (ECF No. 27) at 9, Def.'s MJAR (ECF No. 28) at 9).[3] On January 19, 2021, the SBA found CRFS to be a small business based on its most recently submitted joint venture agreement, thereby denying Yang's protest.[4] SBA Case No. 06-2021-030, Jan. 19, 2021. Yang appealed that decision to the SBA Office of Hearings and Appeals ("OHA"). (Pl.'s MJAR at 10, Def.'s MJAR at 9). Meanwhile, on February 9, 2021, Yang filed its second protest with the GAO. (AR 23692). As a result, the OHA stayed Yang's size appeal, finding that the protest could potentially result in a different awardee. OHA Docket No. SIZ-2021-02-02-136, Feb. 17, 2021.

Yang asserted various grounds in its renewed GAO protest, one assertion being that the Air Force incorrectly evaluated CRFS's past performance. (AR 23702). After some briefing on that issue, the GAO agreed with Yang, holding that the Air Force violated the terms of the Solicitation, which "limits the types of past performance that will be attributed to [a] joint venture by requiring the experience to involve the same functional areas that the joint venture partner is proposed to perform on the AIMS contract." (AR 27621). Based on that finding, the GAO held that the Air Force improperly relied upon Wolf Creek's past performance of the program management and non-mission support services areas in assigning CRFS's favorable past performance rating. (Id.). On May 20, 2021, Yang was officially declared successful in its protest and the GAO recommended "that the Air Force reevaluate CRFS's past performance and make a new selection decision [and] . . . reimburse Yang its costs associated with filing and pursuing the protest, including reasonable attorneys' fees." (AR 27624).[5]

D.    Space Force and Cancellation

Behind the scenes of the AIMS Solicitation and noted protests, there was a simultaneous restructuring occurring within the agency.[6] Specifically, two months after receiving initial proposals for the AIMS contract, on December 20, 2019, Congress established the U.S. Space Force within the Department of the Air Force. National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116-92, 133 Stat. 1198 (2019). Under the U.S. Space Force, Space Wing 45 would be reorganized and reemerge as Space Launch Delta 45 under the Space Operations

---

[3] Record of this appeal does not exist within the Administrative Record but is identically recounted in both parties' briefs. Therefore, it will be taken as true for these purposes.

[4] There is dispute as to the correctness of the SBA's ruling and whether Yang was precluded from providing the SBA with relevant protected information from the GAO record. (Pl.'s MJAR at 13). That issue is not before the Court and will not be further discussed.

[5] In this protest, the Court is not deciding the reasonableness of prior evaluations and thus makes no findings as to the propriety of the Air Force's earlier decisions. The GAO's decision will not be reviewed or analyzed here. Recounting these facts merely illustrates the relevant landscape prior to the cancellation.

[6] Throughout the remainder of this Opinion, the Court will refer to the subject agency as "the Space Force" to accurately reflect the procuring agency.

Center. (AR 27625). The portion of the Air Force that had cognizance over the AIMS procurement became part of the new Space Force; thus, the Space Force absorbed the benefits of the AIMS contract. (AR 27625). As a whole, the Administrative Record is unclear as to what changes the restructuring immediately brought about. The first indirect mention of the Space Force in the Administrative Record is the change in letterhead on communications sent from the CO on February 13, 2020. (AR 4784).

With its change in management and the GAO's order for corrective action, the Space Force determined more operations and maintenance work would be needed on the radar and telemetry systems on Ascension Island. (AR 27625). The CO stated that the AIMS Solicitation only included basic requirements for operation and maintenance of the radar and telemetry systems and ultimately decided this would be insufficient for the current needs. (*Id.*). Specifically, the Space Force determined there was a newly found need for "the ability to troubleshoot faults, in real time, utilizing similar systems with an experienced labor pool that has access to engineering drawings and circuit line record cards" due to recent system failures. (AR 27625–26). The CO drafted a memorandum explaining that the Space Force would terminate the award to CRFS, but it would also "cancel the AIMS Solicitation to decrease risk to the radar telemetry systems, adapt the program to the realignments that have occurred/are occurring under [Space Systems Command], and to refresh the two-year old requirement and resolicit this acquisition." (AR 27626).

On June 23, 2021, one month after the GAO sustained Yang's second protest, the Space Force filed a document with the GAO publicizing its decision and "to advise on the implementation of the corrective action the agency plans to take in light of the GAO's recommendations in relation to sustained protest B-418922.4 and B-418922.6[.]" (Pl.'s MJAR, Ex. A at 1).[7] Foremost, the notice stated the Space Force agreed to terminate CRFS's award. (*Id.* at 1). However, based on the changes described above, the Space Force announced its ultimate decision to "cancel the AIMS Solicitation, and issue a new solicitation that accounts for desired requirement changes that have resulted from reorganizations that arose since the establishment of the U.S. Space Force and subordinate organizations." (*Id.*). Litigation followed that unilateral cancellation.

## II.    Analysis

Before the Court are competing Motions for Judgment on the Administrative Record, the nucleus of each being whether the Space Force had a rational basis to cancel the AIMS

---

[7] Yang moves to complete the record with the agency's attached notice to the GAO of its decision to cancel the AIMS procurement. (Pl.'s MJAR at 12). It argues that because this document is the first notice of the agency's cancellation decision and rationale, it should be part of the Administrative Record. (*Id.* (citing *N. Wind Site Servs., LLC v. United States*, 142 Fed. Cl. 802, 809 (2019) ("Where a party seeks to add to the record materials that were generated or considered by the agency during the procurement and decisionmaking process, such a request is viewed as a request to complete the administrative record."))). The United States does not object; therefore, Yang's exhibit will be considered for the purposes of the motions.

Solicitation. To preface the substance of its analysis, the Court notes that any arguments related to the untoward CRFS awards will not be considered in the merits of this case. Consideration of that award would be improper as it was cancelled prior to total abandonment of the procurement.[8] In other words, the propriety of the Space Force's decision to cancel the AIMS Solicitation is the only issue before the Court, *not* the rationale behind any prior award.

The United States begins by challenging two aspects of justiciability, and thus the Court must address whether Yang has standing to bring this protest and whether it is ripe for decision before it may analyze the merits of the case. The Court finds that Yang has fulfilled the requisite elements to establish both standing and ripeness, thus the Court will proceed to consider this protest on its merits. In bid protests, the Court must consider the entire administrative record and uphold the agency's decision if its decisive path may *reasonably* be discerned. The Court ultimately finds that the United States has met its minimal burden, proving that the Space Force provided a rational, cognizable reason for cancelling the AIMS Solicitation.

A.      Standing

The Court's jurisdictional and justiciability inquiries are distinct. *Baker v. Carr*, 369 U.S. 186, 198 (1962); *Murphy v. United States*, 993 F.2d 871, 872 (Fed. Cir. 1993). An issue is justiciable if it is within the court's competency to supply relief. *Murphy*, 993 F.2d at 872; *see also Fisher v. United States*, 402 F.3d 1167, 1176 (Fed. Cir. 2005). Though justiciability has no precise definition or scope, doctrines of standing, mootness, ripeness, and political question are within its ambit. *Fisher*, 402 F.3d at 1176; *see also Emery Worldwide Airlines, Inc. v. United States*, 47 Fed. Cl. 461, 469 (2000) ("While Congress created this court under Article I of the U.S. Constitution and the 'case or controversy' requirement appears in Article III, the mootness doctrine and other justiciability precepts—including ripeness and standing—have often been properly invoked by this court."). The Court assumes well-pled allegations of error to be true for purposes of the standing inquiry. *Square One Armoring Serv., Inc. v. United States*, 123 Fed. Cl. 309, 323 (2015) (citing *Digitalis Educ. Sols., Inc. v. United States*, 97 Fed. Cl. 89, 94 (2011), *aff'd*, 664 F.3d 1380 (Fed. Cir. 2012)).

At the outset, the United States argues that Yang cannot establish a non-trivial competitive injury stemming from this cancellation that can be addressed by judicial relief, thus it could not establish standing. (Def.'s MJAR at 14). Yang argues to the contrary, maintaining that it has established facts necessary to confer standing because it was an actual offeror to the underlying solicitation. (Pl.'s Resp. at 2–7). Standing is a threshold issue that implicates the Court's subject-matter jurisdiction. *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560–561 (1992). If a plaintiff cannot establish standing, the Court is without jurisdiction to render a decision on the merits of a claim. *Myers Investigative & Sec. Servs. v. United States*, 275 F.3d 1366, 1369–70 (Fed. Cir. 2002).

---

[8] *See* Order Denying Intervention. (ECF No. 17) ("CRFS cannot have a legally cognizable interest to protect when it was no longer the awardee of the now-canceled solicitation, as any challenge to its award would be mooted.").

Under the Tucker Act, the Court has jurisdiction over "an action by an interested party objecting . . . to an alleged violation of a statute or regulation with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). Thus, a party must establish that it is an interested party to confer standing. To satisfy this inquiry in bid protests, the Court looks to the definition of "interested party" provided in the Competition in Contracting Act ("CICA"). *Myers Investigative & Sec. Servs., Inc.,* 275 F.3d at 1370 (quoting *Am. Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001)); *see also* 31 U.S.C. § 3551(2). To have standing, a plaintiff must show that: "'it [(1)] is . . . an actual or prospective bidder and [(2)] . . . has a direct economic interest' in the procurement or proposed procurement." *Diaz v. United States*, 853 F.3d 1355, 1358 (Fed. Cir. 2017) (alterations in original) (quoting *Digitalis Educ. Sols., Inc.*, 664 F.3d at 1384); *see also* 31 U.S.C. § 3551(2).

The general rule is that to show a direct economic interest, the protestor "is required to establish that it had a 'substantial chance' of receiving the contract" but for the error in the procurement process. *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1308 (Fed. Cir. 2006). However, there are exceptions. Challenges to cancelled solicitations and corrective actions regarding re-solicitation of proposals are generally treated as pre-award protests. *Square One Armoring Serv., Inc.*, 123 Fed. Cl. at 327. The Federal Circuit has recognized that when a prospective bidder is challenging a solicitation before the agency makes an award, there is often "no factual foundation for a 'but for' prejudice analysis." *Wks. Marine, Inc. v. United States*, 575 F.3d 1352, 1361 (Fed. Cir. 2009). When that is the case—as it commonly is in pre-award protests—the Court must consider whether the protestor can demonstrate a "non-trivial competitive injury which can be addressed by judicial relief." *Id.* at 1362; *see also Sys. Appl & Techs., Inc. v. United States*, 691 F.3d 1374, 1382 (Fed. Cir. 2012). Alternatively, when an "adequate factual predicate" exists such that the Court can determine whether the protestor had a "substantial chance" to receive the award, the general rule applies. *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1349 (Fed. Cir. 2013); *see also Oracle Am., Inc. v. United States*, 975 F.3d 1279, 1291 n.3 (Fed. Cir. 2020).

The Court lacks a factual predicate to apply the "substantial chance" test and the standing inquiry hinges on whether Yang can demonstrate a direct economic interest affected by the AIMS cancellation. Here, Yang was an actual, competitive offeror to the underlying solicitation. (AR 4050–4618). "[T]o establish a direct economic interest in the procurement, a protester must demonstrate prejudice." *Bos. Harbor Dev. Partners, LLC v. United States*, 103 Fed. Cl. 499, 503 (2012) (citing *Myers Investigative & Sec. Servs., Inc.*, 275 F.3d at 1370). Ultimately, "[p]rejudice is a question of fact." *Bannum, Inc.*, 404 F.3d at 1353. A protestor's showing of prejudice is protest-specific and differs depending upon the nature of its claims. *Square One Armoring Serv., Inc.*, 123 Fed. Cl. at 320.

The Court must look to the record to determine the nature of the protest to establish what is necessary for the Court to find an economic interest. *See Pro. Serv. Indus., Inc. v. United States*, 129 Fed. Cl. 190, 201 (2016) ("[A]s the court of appeals has explained, a protest will, by its nature, dictate the necessary factors for a direct economic interest." (quoting *Sys. Appl. & Techs., Inc.*, 691 F.3d at 1382 (internal quotation marks omitted)). In other words, the facts of the case determine whether there is sufficient injury to support standing and the standard the Court applies. In its Complaint, Yang alleges that it is an interested party because "[b]ut for the

improper cancellation the Agency has announced, [Yang] would have a substantial chance of being awarded the contract." (Compl. at 5).

The United States argues that this is insufficient to confer standing for two reasons: (1) the only competitive injury that Yang may sustain is the monetary cost of submitting a revised bid to compete again for the award, and (2) enjoining the cancellation would not redress Yang because there is "nothing to enjoin." (Def.'s MJAR at 15–16). The United States' argument is misplaced.

First, Yang has properly alleged a competitive injury. Recently, another judge of this Court ruled that agencies "should not be permitted to conduct a procurement, inducing would-be contractors to expend time and money preparing and submitting proposals, only to have the rug pulled out from underneath them when an offeror points out putative flaws in the agency's process." *Tolliver Grp., Inc. v. United States*, 151 Fed. Cl. 70, 120 (2020). Based on its Complaint, Yang's injury argument can be distilled to allege its competitive advantages would be greater if the Space Force had not cancelled the Solicitation. Applying the same logic from *Tolliver Group*, it cannot be that the only non-trivial competitive injury is the costs expended to recompete. *See id*. Yang's non-trivial injury is instead the dependability of the competitive process and an expectation that it will not unexpectedly fold for arbitrary reasons. *See id*.

Further, the United States argues that Yang's injury is not redressable because the Space Force intends to issue a new solicitation at the conclusion of its current bridge contract. (Def.'s MJAR at 16). There are some situations in which the Court should consider a plaintiff's ability to participate in future competition. *See, e.g., Comprehensive Health Servs., LLC v. United States*, 151 Fed. Cl. 200, 207 (2020) (finding that plaintiff could not show irreparable harm because it would not lose an opportunity to compete for a later contract). However, those situations are specific to injunctive relief. *See, e.g., Axiom Res. Mgmt., Inc. v. United States*, 78 Fed. Cl. 576, 600–01 (2007) (assessing "anticompetitive effects on future competition" to determine whether injunction in the public interest). Though the United States asserts that resolicitation is on the horizon, consideration of a future, nonexistent solicitation would be improper in this context. Depending on the terms of such a solicitation, Yang may be excluded as an offeror. Further, a second solicitation is not before the Court. The initial solicitation is. By cancelling the procurement, Yang was "deprived of the opportunity to compete for the provision of" the services sought. *Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008) (finding that loss of "the opportunity to compete" affected potential offerors' direct economic interest). Clearly, Yang, whose offer was in the competitive range for the cancelled procurement, (AR 12673), has alleged that it suffered a "non-trivial competitive injury" due to the cancellation of the Solicitation.

The United States goes on to argue that Yang cannot establish standing because there is "nothing to enjoin" in a cancelled solicitation. (Def.'s MJAR at 15). This argument is fundamentally flawed. The United States pointedly asserts that "if this Court were to find that the [Space] Force acted arbitrarily and capriciously, the Court's authority would be limited to setting aside the award to CRFS and ordering the Space Force to resume its procurement process." (Def.'s MJAR at 16). As the Court broached above, the crux of this case is *not* the prior award to CRFS but cancellation of the Solicitation itself. It is undoubtedly beyond the scope of the Court's jurisdiction to order the Space Force to award a particular party in this context. *See CW Gov't*

*Travel, Inc. v. United States*, 46 Fed. Cl. 554, 559 (2000) ("This court has no authority to select a contractor or order award of the contract to a protestor, but only to stay award or order a new solicitation.") (citations omitted). However, enjoining cancellation of a procurement is within the purview of this Court. *See, e.g., Parcel 49C Ltd. P'ship v. United States*, 31 F.3d 1147, 1154 (Fed. Cir. 1994) (upholding injunction to remedy an improper cancellation that had already occurred and directing the agency to "proceed with due diligence to comply with the spirit of the trial court's injunction and to proceed toward award of [a contract] without unnecessary delay"); *Tolliver Grp., Inc.*, 151 Fed. Cl. at 121 ("To the extent the agency already has cancelled those solicitations, the cancellation decisions hereby are set-aside as unlawful, and the agency is instructed to reinstate the solicitations."); *FMS Inv. Corp. v. United States*, 139 Fed. Cl. 221, 224, 227 (2018) (enjoining a cancellation that occurred four months earlier). Here, should the Court find the cancellation unlawful, judicial relief is limited to setting aside the cancellation and directing the agency to resume its decision-making process under the Solicitation. *See CW Gov't Travel, Inc.*, 46 Fed. Cl. at 559.

Yang—one of three competitive offerors for the AIMS Solicitation—has sufficiently shown that it may have had a competitive advantage but for the government's cancellation. Therefore, it is an interested party. Further, the Court has the power to enjoin a cancellation by directing the agency to reconsider the proposals. Because Yang has properly pled a non-trivial, competitive injury that can be redressed by judicial relief, Yang has established the requirements to confer standing.

### B. Ripeness

The United States also argues that this protest is not ripe because: (1) no case or controversy currently exists between the Space Force and Yang; and (2) withholding a decision on Yang's protest creates no undue hardship on Yang. (Def.'s MJAR at 17–18.) Yang vehemently disagrees, arguing that it has suffered such undue hardship as to ripen this protest, again, because it had a substantial likelihood of award but for the unilateral cancellation. (Pl.'s Resp. at 7–9). Again, the Court agrees with Yang.

A claim is not ripe for judicial review when it is contingent upon future events that may or may not occur. *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985). The ripeness doctrine prevents courts from entangling themselves in abstract disagreements over administrative policies and to protect agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. *Sys. Appl. & Techs., Inc.*, 691 F.3d at 1385 (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967)).

In determining whether a claim is ripe for judicial review, the Court must "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs.*, 387 U.S. at 149. The first prong of the ripeness analysis is not satisfied unless "the challenged agency action is final." *Tokyo Kikai Seisakusho, Ltd. v. United States*, 529 F.3d 1352, 1362 (Fed. Cir. 2008); *accord NSK, Ltd. v. United States*, 510 F.3d 1375, 1384 (Fed. Cir. 2007) (citing *Abbott Labs.*, 387 U.S. at 149). A final agency action is comprised of two elements. "First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Bennett v.*

*Spear*, 520 U.S. 154, 177–78 (1997) (citation omitted). Second, "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* at 178 (citation omitted). The second prong of the ripeness analysis is satisfied when the challenged agency action has an immediate, severe impact on the plaintiff. *Gardner v. Toilet Goods Ass'n*, 387 U.S. 167, 170 (1967).

The United States argues this protest is not ripe because, once a new solicitation is issued, "Yang either may win the award or may protest the outcome if it does not win the award." (Def.'s MJAR at 18). Based on that, the United States asserts the cancelled solicitation "creates no undue hardship" and "could actually benefit Yang." (Def.'s MJAR at 18). This logic is circular. The mere opportunity to recompete for a separate contract with the same agency does not salve the burn of a wrongful cancellation. This is particularly true when the terms of a new solicitation have not been set yet. It is unclear at this juncture whether Yang would be eligible to compete for the smaller-scoped replacement contract as the Space Force has not yet decided on a small business strategy. (Def.'s MJAR, Ex. B at 5 (stating that the Government may use responses to its market research "in determining its small business set-aside decision.")). Although speculative, Yang points out the Space Force's request for information from other socioeconomic groups[9] could mean that the Space Force sets the new contract aside for a particular socioeconomic category of small businesses to which Yang does not belong, thereby excluding it from the competition. (Pl.'s Resp. at 8). At any rate, the possibility for Yang to recompete is contingent on undetermined future events, and thus, the ability to recompete cannot strip this case of ripeness. *Thomas*, 473 U.S. at 580–81.

Contrary to the United States' position, the cancelled solicitation and the possible re-solicitation are two separate events, the latter of which is not realized. Operation of one does not nullify capriciousness of the other. Even if a new solicitation were issued, it would not affect the ripeness of this protest, as the triggering event for Yang's claims was the cancellation itself. *See, e.g., Sys. Appl. & Techs., Inc.*, 691 F.3d at 1381 ("This court has made clear that bid protest jurisdiction arises when an agency decides to take corrective action even when such action is not fully implemented."). Defeat on these grounds would mean a loss of the chance to challenge a possibly unnecessary re-procurement decision. Likewise, the United States' victory on these grounds would strip the Court of jurisdiction for reviewing arbitrary cancellations if an agency asserts a glimmer of a new competitive procurement, of one sort or another, to take place at some indefinite point in the future, and for which a protester *may* be eligible to submit a proposal. Yang has made a showing of immediate and substantial impact in this case. Further, a delay in this ruling would prejudice Yang because, if the cancellation were enjoined, the Space Force would reconsider its original, competitive bid. Under this standard, the Court holds that this protest is ripe for judicial review. The Court now turns to the merits.

---

[9] "This synopsis is encouraging response from qualified and capable Small Businesses (SB) only to include Certified 8(a) Small Businesses, Historically Underutilized Business Zone (HUB Zone), Service Disabled Veteran Owned SB, Veteran Owned SB, Economically Disadvantaged Woman Owned Small Business (EDWOSB) or Woman Owned SB." (Def.'s MJAR Ex. B at 5).

C.      *Jurisdiction and Standard of Review*

Jurisdiction to hear bid protests is based on the Tucker Act, which states, in relevant part, that the Court of Federal Claims has authority:

> [T]o render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement . . . without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1) (2012).

Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotation marks omitted). The Court's standard of review "is highly deferential." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000). If there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (internal citations). Stated differently, "[the Court] will uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

Analysis of a bid protest is conducted in two steps. *Bannum, Inc.*, 404 F.3d at 1351. The Court first determines whether, pursuant to the Administrative Procedure Act ("APA") standard of review, the "agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law." *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907–08 (Fed. Cir. 2013) (citing 28 U.S.C. § 1491(b)(4) (adopting the APA standard of review)). To demonstrate that such a determination is arbitrary or capricious, a protester must identify "hard facts;" a mere inference or suspicion of an actual or apparent conflict is not enough. *PAI Corp. v. United States*, 614 F.3d 1347, 1352 (Fed. Cir. 2010) (internal citations omitted). Examples of arbitrary and capricious actions include "when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The Court's role in reviewing these decisions is to ensure that the agency has acted within a zone of reasonableness, has considered the relevant issues, and reasonably explains its decision. *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021) (internal citations omitted). If the Court finds that the agency acted in error, the Court must determine whether the error was prejudicial. *See Bannum*, 404 F.3d at 1351.

When a solicitation is a "competitive negotiated acquisition" conducted in accordance with FAR 15.3, the source selection authority has the authority to reject all proposals if doing so

is in the best interest of the Government. 48 C.F.R. § 15.305(b). This Court has held that "the cancellation of an [Request for Proposal ("RFP")] is . . . given a great degree of discretion." *DCMS-ISA, Inc. v. United States*, 84 Fed. Cl. 501, 511 (2008). Given the great degree of discretion afforded an agency when deciding to cancel an RFP, this Federal Circuit has held that this Court must "merely find that the agency provided a coherent and reasonable explanation of its exercise of discretion." *Id.*; *see also Croman Corp. v. United States*, 724 F.3d 1357, 1363–65 (Fed. Cir. 2013); *Inverness Techs., Inc. v. United States*, 141 Fed. Cl. 243, 249–51 (2019); *FMS Inv. Corp.*, 139 Fed. Cl. at 224–25, *amended*, 139 Fed. Cl. 439, 440 (2018); *A Squared Joint Venture v. United States*, 145 Fed. Cl. 676, 681 (2019).

Bid protests are typically disposed of on motions for judgment on the administrative record like those pending before the Court. Unlike the standard applied in summary judgment motions, "the existence of genuine issues of material fact does not preclude judgment on the administrative record" under RCFC 52.1. *Tech. Sys., Inc. v. United States*, 98 Fed. Cl. 228, 242 (2011); *see also* RCFC 56. Rather, the Court's inquiry is whether, "given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A&D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006) (citing *Bannum*, 404 F.3d at 1356).

      D.     *Agency Decision*

In this bid protest, the Court must review the Administrative Record to determine if the decision to cancel the solicitation was reasonable, coherent, and justified. The nature of this Court's review of challenges to an agency's corrective action was recently examined in *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982 (Fed. Cir. 2018). Relevant here, the Circuit made clear that the "'[C]ourt may set aside a procurement action,' such as a corrective action, 'if . . . the procurement official's decision lacked a rational basis.'" *Id.* at 990 (quoting *Centech Grp. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009)). The Federal Circuit also stated that "corrective action only requires a rational basis for its implementation" and that the rational basis review for agency corrective actions is highly deferential. *Id.* at 991; *see also Croman Corp.*, 724 F.3d at 1363. The agency's burden is satisfied if the agency "provided a coherent and reasonable explanation of its exercise of discretion." *Id.* (quoting *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2009).

As recently iterated in *Tolliver Group*, there is no universal test for what constitutes an agency's failure to provide a sufficient justification for its actions and no one factor is dispositive. 151 Fed. Cl. at 111–12 (citing *Sierra Nevada v. United States*, 107 Fed Cl. 735, 751 (2012)). Various decisions from the Court of Federal Claims have explained that an agency decision is reasonable and will go unscathed if the agency substantiates its conclusion with *some* support. *Cf. id.* at 109 (finding cancellation unreasonable when decision was bereft of specific context and factual details that would support its generalized assertions and naked conclusions about the agency's needs or how the agency would be better served); *FMS Inv. Corp.*, 139 Fed. Cl. at 223–25 (finding that the agency acted unreasonably when its decision to cancel relied on a brief administrative record and did not contain detailed information to support important assertions made in the notice); *Inverness Technologies, Inc.*, 141 Fed. Cl. at 248, 251–53 (emphasizing that the agency's decision to cancel was reasonable because the agency's memorandum was "comprehensive, well-considered and logical" and "outlined, in chart form, key differences between the solicitation and the new requirements.").

Against that background, the Court considers the parties' arguments as to the rationality of the AIMS cancellation. In determining whether the agency adequately explained its reasoning, the Court considers the explanation provided by the agency at the time of its decision-making. *See WHR Grp., Inc. v. United States*, 115 Fed. Cl. 386, 399 (2014) (noting that the agency decision must be supported by the reasoned basis the agency provided). The Administrative Record includes the CO's Corrective Action Memoranda. (AR 27625–626). Because of its conspicuous brevity, the Court will quote it in its entirety:

> 1. The purpose of this memorandum is to document the decision to take corrective action on the subject protested award of the Ascension Island Mission Services contract.
>
> 2. On May 20, 2021, GAO sustained the protest filed by [Yang]on February 9, 2021 and recommended that the Air Force re-evaluate CRFS' past performance and make a new source selection decision.
>
> 3. As the Contracting Officer for the procurement, I have carefully reviewed the GAO decision. I had a discussion with my source selection team. The following events have occurred since the release of the original Ascension Island Mission Services (AIMS) contract:
>
>> a. The U.S. Space Force became a new military service, under which the SW 45 has been reorganized and reemerged as Space Launch Delta 45 (SLD 45) under the Space Operations Center (SPoC). Further realignment will occur this summer (2021) as Space Systems Command (SSC) stands up as our Field Command. This realignment resolves an organizational inefficiency which drove the AIMS acquisition strategy of combining the 12.15 Radar and TAA-3 telemetry systems on Ascension Island with the facilities and infrastructure requirements. Under the previous organization structure, operational responsibility and authority of contract execution were divided between the on-island commander, and the Space and Missile Center in Los Angeles (via the Launch and Test Range Services Integrated Support Contract (LISC)) creating divisions in operational control on the island. Through the realignment under SSC, Space Launch Delta 45 will gain full program management of the LISC contract as well as acquisition authority over the associated follow-on contract. Gaining this program responsibility negates the need to de-scope these requirements from the LISC contract.
>
>> b. The Government has identified that having the 12.15 and TAA-3 telemetry systems on the AIMS contract creates a significant maintenance gap for the aging radar and telemetry systems. Specifically, AIMS provides only level 1 Operations and Maintenance (O&M) of the radar and telemetry systems. However, recent system failures with the radar has identified the need for reach back, intermediate level maintenance through the use of uprange technicians at Cape Canaveral Air Field Station working on similar systems such as radar 19.14 and

Tel-IV telemetry site. Specifically, the ability to troubleshoot faults, in real time, utilizing similar systems with an experienced labor pool that has access to engineering drawings and circuit line record cards provides significantly more capability to ensure mission system uptime by providing a higher level of maintenance. Separating the Ascension radar and telemetry systems from the similar systems on the LISC contract removes this capability and, ultimately, increases the risk of not being able to meet system uptime requirements.

4. For the reasons specified above, amending the solicitation is not appropriate because descoping the radar and telemetry requirements is approximately 16% of scope requirements or approximately $18 million total dollars of the AIMS requirements. As the radar and telemetry portion of the AIMS contract is being descoped, offerors may propose differently. I have determined the best course of action is to terminate the award, cancel the AIMS Solicitation to decrease risk to the radar telemetry systems, adapt the program to the realignments that have occurred/are occurring under SSC, and to refresh the two-year old requirement and resolicit this acquisition.

*Id*.

Yang asserts three theories illustrating why the decision to cancel the AIMS Solicitation was arbitrary and capricious. It first argues that the Administrative Record is devoid of a requirements-change sufficient to cancel the procurement. (Pl.'s MJAR at 18–27). Second, Yang argues that the Space Force did not consider the other goals of consolidating the contracts or the potential negative effects of cancelling such. (Pl.'s MJAR at 27–33). Finally, Yang argues that the Administrative Record fails to address why consolidation would be the desirable route. (Pl.'s MJAR at 33–35). The Court will address those arguments in turn.

As to whether the Administrative Record shows changes necessary to cancel the procurement, Yang initially argues that the record demonstrates that portfolio ownership and organizational ease was only one of multiple reasons the agency decided to consolidate radar and telemetry requirements in the AIMS contract, and it should therefore not be a determining factor. (Pl.'s MJAR at 18–23). Prior to the GAO's determination, Space Wing 45 underwent a significant reorganization; specifically, it went from being under the purview of the Air Force, to being part the Space Force after its inception. (AR 27625). Notably, Space Wing 45 became the Space Launch Delta 45 prior to the GAO's determination; the United States asserts that the reorganization affected contracting efforts immediately following the GAO's determination. (Def.'s MJAR at 22).

Though the Space Force was created in December 2019, (Pl.'s MJAR 4), the United States notes that the transfer of components from the Air Force to the Space Force has been a gradual process that is still incomplete. (Def.'s MJAR at 22). However, the CO does address these concerns. In its notice to the GAO, the Space Force asserted that it intended to cancel the AIMS Solicitation because of "desired requirement changes that have resulted from reorganizations that arose since the establishment of the U.S. Space Force and subordinate organizations." (Pl.'s MJAR Ex. A at 1). To illuminate effects of the reorganization, the United

States notes that the oversight of operations at Ascension Island would now be done completely out of a single office. (*See* AR 27625). This is a valid consideration, particularly because the Administrative Record indicates that it was a motivating factor for consolidation in the first place. (AR 370 (Source Selection Bottom Line, stating: "History has shown that it is very difficult having multiple contractors supporting a geographically separated unit; the proposed contract structure aligns base requirements to one contract.")). Thus, the efficiency intended by consolidating the operations contract and the radar and telemetry contract was mooted by reorganization. Stated more plainly, the contracts can now be completed separately by separate contractors but overseen by the same office; this may correct the agency's motivating concerns. (*See* AR 27625). Yang specifies various other goals the Space Force should have considered, but each of those can be distilled into problems arising from non-singular ownership of the contracts.[10] The CO broadly states that this realignment "resolves an organizational inefficiency which drove the AIMS acquisition strategy of combining the 12.15 Radar and TAA-3 telemetry systems on Ascension Island with the facilities and infrastructure requirements." (AR 27625). However broad this may be, "organizational inefficiencies" encompass each of the AIMS Solicitation goals as summarized by Yang.

Yang goes on to assert that the Space Force's goal of avoiding divisions in operational control on the island is equally well served by leaving the AIMS requirements as they are and de-scoping the radar and telemetry work. (Pl.'s MJAR at 19–20). This is directly mentioned by the CO in their decision, asserting that through the realignment, "Space Launch Delta 45 will gain full program management of the LISC contract as well as acquisition authority over the associated follow-on contract. Gaining this program responsibility negates the need to de-scope these requirements from the LISC contract." (AR 27625). The record shows that none of the five small business offerors that submitted offers for the AIMS Solicitation were able to perform radar and telemetry without either a large business joint venture mentor or a large business subcontractor. (AR 3115, 3605, 8881, 11261, 11266, 10671). Because of costs considered by those joint ventures and large business subcontractors, the bids will likely look very different for a de-scoped solicitation.

The Administrative Record further demonstrates that separating the requirements into two contracts is more beneficial to the Space Force because the needs specific to radar and telemetry have changed since the Solicitation was originally issued in 2019. As the CO explains, due to "recent system failures,"[11] the Space Force determined a need for "the ability to troubleshoot faults, in real time, utilizing similar systems with an experienced labor pool that has access to engineering drawings and circuit line record cards." (AR 27625–26). As helpful as an

---

[10] Those benefits include: (1) having a single contract, with a single on-site contractor, for all Ascension Island requirements; (2) elimination of inefficiencies and ambiguous contractual divisions of labor; (3) elimination of historic seams, gaps, and duplications created by having two parallel contracts; (4) mitigation of the performance risks created by these historic problems; and, (5) furthering small business goals by moving radar and telemetry currently performed by a large business onto a small business set-aside contract. (Pl.'s MJAR at 20).

[11] The CO's decision does not specify what those failures were.

elaboration on "system failures" may have been, the CO is not required to provide the specificities in excessive detail. Though the decision is vague as to what those failures consisted of, one can reasonably deduce that a failure occurred and was not realized in real time, and there was likely little access to relevant documents to fix those problems. Accordingly, the needs for radar and telemetry have increased to beyond those initially stated in the AIMS Solicitation. This is a particularly compelling reason for cancellation because the needs increased in an area that was already a source of concern for offerors. Therefore, considering the totality of the circumstances, separating the contracts would be a reasonable choice.

In its Motion, Yang does not agree with the Space Force's characterization of its radar and telemetry requirements. (Pl.'s MJAR at 23–27). This is due to the relatively young age of the radar system and the lack of clarity surrounding issues and failures concerning the radar. (*Id*. at 23). As to the age of the system, the Court must consider the circumstances surrounding the system's location. While it is only two years older than when the AIMS procurement was initially solicited, it has spent that time subject to the elements of a corrosive environment. (AR 507). In addition, the record indicates that the radar system is past its planned service life. (AR 27625). In the notice of cancellation, the CO explains that, for the radar system to be successful, the contract must account for "the ability to troubleshoot faults, in real time, utilizing similar systems with an experienced labor pool that has access to engineering drawings and circuit line record cards provides significantly more capability to ensure mission system uptime by providing a higher level of maintenance." (AR 27625–26). Though "system failures" lacks ideal specificity, radar and telemetry requirements made up 35% of the AIMS Solicitation. Because of its significance, it was reasonably considered by the CO in support of cancelling the Solicitation.

As a factor weighing for cancellation, the CO's memorandum addresses the level of maintenance needed to keep those systems functioning. They specifically state that "AIMS provides only level 1 [O&M] of the radar and telemetry systems. However, recent system failures with the radar have identified the need for reach back, intermediate level maintenance using uprange technicians at Cape Canaveral Air Field Station working on similar systems . . .." (AR 27625). Based on that explanation, it is apparent that the AIMS Solicitation does not provide for the additional work or maintenance that the system needs, and the work cannot simply be scaled upwards or downwards. Thus, to account for the additional work, "the [Space Force] would need to make changes to the contract because an agency cannot simply request services that would fall outside the scope of the contract." (Def.'s MJAR at 26 (citing *AT&T Commc'ns, Inc. v. Wiltel, Inc.*, 1 F.3d 1201, 1205 (Fed. Cir. 1993) (finding that contract changes going beyond the scope of contract constituted breach of contract))).

Yang opines that the Space Force failed to consider important aspects of the problem it was trying to address through the AIMS contract, or those it created with the cancellation, therefore the decision could not be reasonable. (Pl.'s Mot. 27–33). As shown above, the need for separate contracts has been negated by the consolidation of offices. Further, de-scoping the radar and telemetry work would likely result in a far different solicitation, and thus very different proposal submissions. Consideration of those proposals would be inefficient to the agency and preparation would be inefficient to the bidders who had already secured either a joint-venture mentor or large business subcontractors.

The United States suggests, and the cancellation notice supports, that by separating the requirements, it may open the door to greater competition by giving more companies a chance to submit an offer. (*See* AR 27625–26). Two contracts give the agency greater flexibility and allow the Space Force to procure services commensurate with its needs. (Def.'s Reply at 15, ECF No. 30). This division of work could hypothetically assist contractors by giving more small businesses an opportunity to bid on a future solicitation. Stated differently, by separating the requirements for radar and telemetry from AIMS, a separate solicitation would open the door to businesses currently lacking those capabilities but are able to provide the non-mission support requirements. (Def.'s MJAR at 24). Thus, the Court does not find that the Space Force outwardly ignored the problems it was attempting to address.

Finally, Yang broadly states that the record does not rationally show why cancellation would be desirable. (Pl.'s MJAR at 33). In considering other routes, Yang suggests that the Space Force amend the AIMS Solicitation to remove the radar and telemetry work. (Pl.'s MJAR at 34). However, the United States argues that this route would force offerors to again revise their proposals and would create more difficulties in the award process. (Def.'s MJAR at 27). In *Dell Federal*, the Federal Circuit held that the procuring agency "was not legally required to address every [corrective action] option, but rather to provide a reasonable corrective action and adequately explain its reasoning for doing so." 906 F.3d at 998. As analyzed above, choosing not to de-scope the contract was reasonable under the circumstances presented. Yang's proposed corrective action would be essentially the same as issuing a new solicitation but involve an inefficiency of review and involve more pitfalls in altering proposals. Thus, the Space Force was not required to analyze this path of corrective action, and it does not appear that it would be a more reasonable choice if it had.

The Supreme Court of the United States has stated that, in defining the arbitrary and capricious standard of review of agency action, a court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp.*, 419 U.S. at 286. Here, then, the burden on the Space Force is to provide a record of the rationale for the cancellation decision, so that the court may determine if this record provides a coherent and reasonable explanation of its exercise of discretion. *See Banknote*, 365 F.3d at 1351. Though the cancellation decision is admittedly scant, when considering the record in total, the Court finds that the Space Force has met its minimal burden. Compellingly, the landscape created by the Space Force's absorption has negated the initial purpose of consolidating the operational and radar and telemetry contracts—now, those programs will be monitored by the same office and do not need to be administered through a single contract. This eliminates the shortcomings presented in the radar and telemetry contract and is therefore in the best interest of the United States. The Space Force made missteps in its prior awards and the Court does not doubt that this route of correction is a far cry from the beaten path. However, those mistakes taken in combination with changes to the contract outside of its control lead to the only reasonable course of corrective action to cancel the Solicitation and regroup.

Even in its haze, the Court finds that the Space Force's path is reasonably discerned through the Administrative Record. As stated above, the Administrative Record demonstrates the decision to cancel the Solicitation and issue a new one more oriented with its technical and service requirements was reasonable. The Space Force has provided a "coherent and reasonable

18

explanation of its exercise of discretion." *Dell Fed. Sys. L.P.*, 906 F.3d at 992. Thus, its decision will go undisturbed.

     E.     *Injunctive Relief*

Proving success on the merits is a necessary element for a permanent injunction. *Id*. at 999. Since Yang failed to establish success on the merits for the reasons set forth above, injunctive relief would be likewise inappropriate.

The United States concedes that "this Court reviews an agency's procurement decisions to determine whether they are supported by the already-existing administrative record." (Def.'s MJAR at 19 (citing RCFC 52.1)). The Court notes that relevant sections of the United States' statement of facts discussing the cancellation cites a *post hoc* declaration that is not part of the record. (Def.'s MJAR at 10–12). Because the Court is limited to considering such a declaration for analysis of the balance of harms and public interest under the injunctive factors, the Court has not considered this document in deciding the merits of this case. However, this declaration is significant as a comparison to the vexingly succinct and opaque decision of the CO. Had the cancellation decision been documented with as much clarity as the *post hoc* declaration, much of the United States', Yang's, and the Court's time could have been saved in reviewing these claims, the 28,276-page Administrative Record, and this decision.

As is previously noted, the standard for these decisions does not require crystal clarity. Even so, the Court would urge agencies to consider the resources—specifically, bidders' and taxpayers' dollars—that must be utilized for poorly documenting such decisions. This is made abundantly apparent when declarations such as the one cited to by the United States illustrate that agencies have the capability to expound upon their reasoning in greater detail.

### III.    Conclusion

For the reasons set forth above, the Court finds that the Space Force's provided a rational, cognizable reason for its decision to cancel the AIMS Solicitation. Therefore, the United States' Cross-Motion for Judgment on the Administrative Record, (ECF No. 28), is **GRANTED** and Yang's Motion for Judgment on the Administrative Record, (ECF No. 27), is **DENIED**. The Clerk is directed to enter judgment in accord with this opinion. Each side shall bear its own costs.

On or before October 22, 2021, the United States is **ORDERED** to file a Notice that contains a statement indicating whether the parties seek redactions to the public version of this Opinion. That Notice must represent whether the United States has discussed the matter with opposing counsel and the extent of agreement as to the redacted content. The proposed redactions must be reflected in a PDF attached as an exhibit to that Notice.

**IT IS SO ORDERED.**



                                      s/   David A. Tapp
                                      DAVID A. TAPP, Judge